UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MELISSA NEWMAN,                                    :

                Plaintiff,                    :                    16 Civ. 9325 (AJP)

            -against-                    :                    **OPINION & ORDER**

NANCY A. BERRYHILL,                              :
Acting Commissioner of Social Security,
                                 :

               Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

         Plaintiff Melissa Newman, represented by counsel, brings this action pursuant to

§ 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the

Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB").

(Dkt. No. 1: Compl.)  Presently before the Court are the parties' cross-motions for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 16: Newman Notice of Mot.; Dkt. No. 23:

Comm'r Notice of Mot.)

         For the reasons set forth below, the Commissioner's motion (Dkt. No. 23) is <u>DENIED</u>

and Newman's motion (Dkt. No. 16) is <u>GRANTED</u> to the extent of remanding the case to the

Commissioner for further consideration.

**FACTS**

**Procedural Background**

         Newman filed for DIB on November 15, 2013, alleging a disability onset date of

September 25, 2012.  (Dkt. No. 12: Administrative Record ("R.") 115-21, 160.)  On October 22,

2015, represented by counsel, Newman had a hearing before Administrative Law Judge ("ALJ")

Michael Stacchini.  (R. 29-56.)  On November 18, 2015, ALJ Stacchini issued a written decision finding Newman not disabled within the meaning of the Social Security Act.  (R. 9-23.)  ALJ Stacchini's decision became the Commissioner's final decision when the Appeals Council denied review on October 6, 2016.  (R. 1-4.)

**Non-Medical Evidence and Testimony**

Born on January 29, 1979, Newman was thirty-three years old at the alleged September 25, 2012 onset of her disability.  (R. 151, 160.)  She completed two years of college in 1999 and specialized training in cosmetology in 2008.  (R. 164.)  Newman performed clerical work for an insurance company between 1997 and 2001, and again between 2006 and 2009.  (Id.)  She worked as an aesthetician from November 2011 until the September 2012 onset of her disability.  (Id.)  In connection with her application for DIB, Newman reported that her ability to work was limited by complex regional pain syndrome ("CRPS")[1] and numbness in her right index finger, as well as depression and anxiety.  (R. 163.)

In a December 2, 2013 Function Report, Newman stated that she is left handed and able only to use that hand.  (R. 181-84.)  Pain and numbness in her right hand affected her sleep and caused difficulty with bathing, dressing, feeding herself, handling cash and change, climbing stairs, kneeling, and reaching.  (R. 179-80, 182-84, 185.)  Newman had trouble walking more than a "limited distance" due to her "meds & hand swelling."  (R. 183, 185.)  She was unable to care for

---

[1]  "CRPS is a chronic pain syndrome most often resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury affecting other parts of the body.  Even a minor injury can trigger . . . CRPS.  The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. . . .  It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual." SSR 03-2P, 2003 WL 22399117 at *1 (Oct. 20, 2003).

her hair, cook, open cans or water bottles, make beds, clean, perform any "household duties that require 2 hands," lift objects requiring two hands, or squat.  (R. 179-81, 183-84.)  Newman could go shopping, but only with assistance from friends or relatives.  (R. 181-82.)[2/]  She wore a splint and sling "daily," and she wore a compression glove "at all times" because she could not "handle air hitting [her] hand."  (R. 184-85, 188.)

Newman reported that the "constant pain" in her right hand began in March 2012 when she tore a tendon.  (R. 183, 186.)  Since her initial injury, her pain had gone "from just the injured area to the entire [right] side" of her upper body.  (R. 187.)  Her pain ranged from "dull to stabbing to aching constantly" and went from the palm of her right hand "all the way up [her] arm to [her] head."  (R. 186.)  She reported having chronic pain "always . . . all day" and that "everything" would bring on the pain.  (R. 187.)  She treated her pain with Dilaudid, which affected "thinking & ability to drive & function."  (R. 187-88.)  Specifically, the side effects of her pain medication—drowsiness and dizziness—rendered her "unable" to drive, socialize or exercise, and also caused difficulty with reading and standing.  (R. 180, 182-83.)  After walking for ten to thirty minutes, she would need to rest "until [her] pain meds kick[ed] in."  (R. 185.)  She reported problems paying attention and finishing tasks while on her medication.  (Id.)

With regard to her mental impairments, Newman reported that she "cannot handle changes & stress d[ue] to depression, anxiety."  (R. 186.)  Her anxiety "began as a child" but "ha[d] increased tremendously d[ue] to" her hand injury.  (R. 188.)  She experienced panic attacks that manifested in "rapid heartbeat, shortness of breath, need to flee, sweating" and feeling like she was going to faint.  (Id.)  To relieve an attack, she would "confine [her]self to a quiet room, take deep

---

[2/]     Newman had a "limited" ability to travel by herself.  (R. 189.)

breaths & take Klonopin." (R. 189.)

Newman reported that she was able to prepare "cereal & non-stove top meals." (R. 180.) She watched television and spent time with others "in person & on the phone" daily. (R. 182-83.) She reported no problems getting along with family, friends, neighbors, bosses or other authority figures. (R. 183, 185.) Her impairments did not affect her abilities to sit, see, hear or talk (R. 184); she had no trouble with remembering things (R. 186) or following simple written and spoken instructions (R. 185).

During her ALJ October 22, 2015 hearing, Newman testified that she had done no household chores, including cooking, since her initial injury in March 2012. (R. 35-36.) She had gone shopping only with her mother's assistance since September 2012. (R. 36.) Her symptoms worsened after her first right hand surgery on December 3, 2012 (R. 36, 39), which resulted in a loss of feeling in her right index finger (R. 40) and the inability to use her right hand (R. 40-41). She attempted to go back to work in early 2013 as a part-time gym receptionist, but lasted only three weeks due to her impairments. (R. 37-38.) She underwent a second surgery on her hand in July 2013. (R. 37.) She filed for benefits in November 2013 because she "realized after [a] third surgery that [she] couldn't do anything really." (R. 38.) She testified that her symptoms continued worsening since filing for DIB (id.), and that her CRPS worsened again after a fourth hand surgery in September 2014 (R. 34; see also R. 40 ("I think every surgery I've had it's gotten worse.")). Since her fourth surgery, her right index finger "ha[d] basically been paralyzed." (R. 40.)

Beginning in December 2014, Newman wore a splint and sling at all times. (R. 41.) When not wearing a splint, she wore a compression glove because "[i]t hurt to touch the air." (R. 34, 41.) Pain rendered Newman unable to do laundry or tie her shoes. (R. 36, 45.) Her mother typically prepared her meals. (R. 36.) Other family members or a neighbor assisted with chores and

meals when her parents were gone for extended periods.  (R. 34-36.)  She spent her free time visiting doctors and therapists and, when at home, she would "lay[] on the couch watching TV when" unable to read.  (R. 38.)

Newman described her pain as "like a 300-pound man sitting on my hand and my shoulder."  (R. 42.)  Pain sometimes left her bed-ridden, especially during inclement weather.  (R. 34-35.)  Newman testified that during the winter, for example, her "pain [was] . . . like if I could say 100 out of a 10 scale, I would."  (R. 35.)  When experiencing such pain, she would not leave her bedroom and might stay in bed "for weeks at a time."  (Id.)  She avoided drinking water "because to get up to go [to] the bathroom is a struggle."  (Id.)  She felt "excruciating" pain when water hit her right arm (R. 49); taking a shower sometimes felt "like . . . glass hitting" her, and she would be "bed-bound for about 2-3 hours" afterwards (R. 48).  Medication brought her pain down to "about a 7" on a ten-point scale but also made her confused and nauseous.  (R. 45.)  She also experienced tremors after occupational or physical therapy sessions and when startled.  (R. 44.)  For example, when "in a car and the car slams on the brakes really quick and it scares [her], [she] go[es] into full tremors."  (Id.)  Similarly, "[r]ain and snow put[] [her] into severe tremors."  (R. 39.)

At the time of her hearing, Newman was not receiving treatment for her upper back and neck disc degeneration.  (R. 42-43.)  Regarding her depression and anxiety, Newman testified that she has had it her "whole life."  (R. 43.)  She felt like a burden on her family and was "always upset."  (Id.)

In April 2015, Newman's legs—especially the right leg—began to experience "a totally different pain than what [she] ha[d] in [her] hand."  (R. 43-44.)  She "would feel aches and pains even in [her] toes [and] in all the joints of [her] body."  (Id.)  She could not bend her leg and had "fallen because [she] lost all feeling in [her] leg."  (R. 44-45.)  Although she typically carried

a cane on the advice of her physical therapist, she "tr[ied] not to use it." (Id.) Newman testified that she recently began experiencing numbness and tingling in her left arm lasting between ten and twenty minutes. (R. 48.)

At the time of her hearing, Newman was attending occupational and physical therapy roughly four times a month each. (R. 47.) She visited a cognitive behavioral therapist every week, a psychiatrist every two months, and a neurologist once a month. (R. 47-48.) In total, she left her house roughly four times per week to attend medical appointments. (Id.)

**Medical Evidence Before the ALJ**

### Physical Impairments

#### 2012-2013

In March 2012, Newman received treatment for a tendon injury in her right hand. (See R. 272, 283.) Between March and July 2012, she received three cortisone injections to treat carpal tunnel syndrome and trigger finger in her right hand. (See R. 283.) On December 3, 2012, she underwent carpal tunnel and index trigger finger release surgery. (R. 676; see also R. 272, 283, 325.) On December 20, 2012, Newman presented to Dr. Joseph Rothenberg with complaints of pain and numbness in her right index finger and hand. (R. 325-26.) Examination revealed mild swelling and hypersensitivity to touch. (Id.) During a January 2, 2013 follow-up appointment, Dr. Rothenberg contemplated a possible CRPS diagnosis and noted that Newman's symptoms improved with medication. (R. 327-28.)

Newman saw Dr. Rothenberg again on January 24, 2013 with complaints "of significant stiffness in her second digit." (R. 323-24.) She denied significant pain, but reported functional limitations "due to altered sensorium in her right hand." (R. 323.) On examination, Dr. Rothenberg noted mild swelling, full range of motion in the right wrist, restricted range of motion

in the right index finger on extension with discomfort, impaired hand strength due to discomfort, and "hypersensitivity throughout the wrist and hand area, except for decreased sensation on the 2nd digit." (Id.) Dr. Rothenberg diagnosed Newman with "Right Wrist Complex Regional Pain Syndrome" and recommended follow up with a psychiatrist. (Id.) On March 26, 2013, Newman reported to Dr. Rothenberg that her CRPS symptoms were "waxing and waning." (R. 322.) Examination revealed that her surgical incision was healing well, there was no swelling, she had "mild restriction at extremes of motion for the 2nd digit," her hand strength was "mildly reduced due to pain," and she was still experiencing "hypersensitivity to touch." (Id.)

On February 1, 2013, Newman presented to Dr. Joyce Mednick of Valley Hospital with complaints of right hand pain and swelling. (R. 272-78.) She was diagnosed with a ganglion cyst and cellulitis of the right hand; she was prescribed antibiotics. (R. 274-75.)

Between January 3 and April 8, 2013, Newman attended twenty-one occupational therapy sessions at Crystal Run Healthcare. (R. 280-320, 382-402.) During these sessions, Newman reported pain in her hand, wrist and finger ranging from "0/10" at rest (see, e.g., R. 283) to "8/10" (see, e.g., R. 386); popping, numbness, sensitivity and tightness along the tendon of her right index finger (R. 292, 295, 304, 312, 385, 388); trouble sleeping due to pain (see R. 292, 298, 318); increased pain with cold, damp weather (R. 388); and tremors in her hand (R. 382). Her occupational therapists initially noted decreased range of motion and lack of strength in her right hand. (R. 284.) During later sessions, they reported "clicking with 2nd digit flexion" of Newman's right hand (R. 299); frequent inability to tolerate exercises due to pain (see R. 307, 316, 383, 392, 395, 398); and occasional improvement in range of motion (R. 319, 392).

On July 31, 2013, Newman presented to Dr. Steven Lee with complaints of pain, decreased range of motion and decreased sensation in her right index finger. (R. 348-50.) Dr. Lee

performed surgery on her right index finger to remove an arterial mass pressing on her radial digital nerve, to free her tendon from inhibiting scar tissue, and to remove scar tissue entrapping her ulnar digital nerve. (R. 348-50.) On September 11, 2013, Newman presented to Dr. Lee with a right hand laceration; she had fallen and cut her hand on a piece of glass on September 6, 2013. (R. 346.) Dr. Lee cleaned her wound, verified that her tendons were intact, and released fibrous bands around her radial digital nerve. (R. 346-47.)

Between August 13 and November 15, 2013, Newman attended occupational therapy sessions at Crystal Run Healthcare another fourteen times. (R. 403-26, 445-48, 502-04, 520-43.) During these sessions, Newman reported pain ranging from "3/10" (see, e.g., R. 412) to "10/10 . . . even with pain medication" (see, e.g., R. 409); continued numbness in her right index finger (R. 524); difficulties with activities of daily living ("ADLs") (R. 416, 524); continued sensitivity and increased pain with cold weather (R. 532, 537); and inability to use her right hand (R. 541). Newman's occupational therapists noted increased pain after treatment (R. 419, 503); that she was often able to complete her treatment despite pain (R. 422, 425, 446, 521, 525, 529, 533); that her incision scar and hand were sometimes sensitive and/or painful to the touch (R. 503, 538, 542); and occasional improvements in range of motion (R. 525).

Dr. Lee referred Newman to Crystal Run Healthcare for pain management, which she began with a visit on October 2, 2013. (R. 352, 430-31.) Nurse Practitioner ("NP") Lura Wendy Marks noted Newman's complaints of "pain of 8/10 located in right hand" (R. 352) aggravated by "temperature changes, bad weather, driving, OT [occupational therapy], everything" (R. 431), as well as "numbness, weakness, tightness, spasms, [and] tingling" in her right hand (id.). NP Marks noted that Newman "experiences relief by pain meds." (R. 352.) Newman's exam was normal apart from decreased flexion/extension and range of motion in her cervical spine due to spasm and pain,

as well as 4/5 right wrist strength and 3/5 right hand grip strength. (R. 353.) NP Marks recommended continued occupational therapy with a focus on desensitization and referred Newman for cognitive behavioral therapy. (Id.) In a treatment note also dated October 2, 2013, Dr. Thomas Booker opined that Newman "likely ha[d] CRPS of her right hand." (R. 429.)

On October 23, 2013, Dr. Booker wrote a "To Whom It May Concern" letter stating that Newman was being treated for right hand pain, that she likely had CRPS, and that he was "waiting for results of a Triple Phase Bone Scan that was ordered on October 2nd, 2013 to confirm this diagnosis." (R. 428.) On October 28, 2013, Newman presented to Dr. Booker with complaints of "pain of 5/10 located in hand." (R. 495.) Newman had not undergone a bone scan; Dr. Booker recommended that she consider a stellate ganglion block. (R. 494-96.)

On November 12, 2013, Dr. Dennis Scharfenberger, Newman's primary care physician, completed a Medical Report for Determination of Disability form. (R. 427.) Dr. Scharfenberger checked boxes indicating that Newman could stand and walk for less than two hours per day, and could sit for less than six hours per day. (Id.) She had limitations to crouching, squatting, climbing, manipulating with her right hand, and driving a vehicle. (Id.) However, Dr. Scharfenberger failed to check boxes corresponding to Newman's ability to lift and carry various weights, and he indicated that she had no mental limitations or limitations to seeing, hearing or speaking. (Id.)

On November 26, 2013, Newman underwent a ganglion block. (R. 360, 498-500, 545-49.) She tolerated the procedure well without complications. (R. 500.)

On December 2, 2013, Dr. Lee completed a Medical Report for Determination of Disability form. (R. 602.) Dr. Lee checked boxes indicating that Newman could stand and walk for less than two hours per day, and could sit for less than six hours per day. (Id.) She had

limitations to crouching, squatting, climbing, manipulating with her right hand, and driving a vehicle. (Id.) Dr. Lee failed to check boxes corresponding to Newman's ability to lift and carry various weights, and he indicated that she had no mental limitations or limitations to seeing, hearing or speaking. (Id.)

On December 30, 2013, Newman presented to Dr. Booker with "pain of 7/10" in her right hand. (R. 604.)

**2014**

On January 21, 2014, Dr. Richard Goccia performed a consultative examination of Newman in connection with her DIB application. (R. 554-57.) Newman reported that she helped with cleaning, laundry and shopping; she showered and dressed herself without assistance; she watched television, listened to the radio and read; but she needed to be driven to doctor's appointments. (R. 555.) On examination, Dr. Goccia found Newman to be in no acute distress. (Id.) Her cervical and lumbar spines showed full flexion, extension and lateral flexion bilaterally; she demonstrated full rotary movement bilaterally. (R. 556.) She had full range of motion in her shoulders, elbows, forearms and wrists bilaterally. (Id.) She had "5/5" grip strength on the left, but "declined to attempt grip strength on the right." (Id.) She had "incomplete flexion at the MCPs of her second through fifth fingers and incomplete flexion of her MCP and IPJ of the thumb." (R. 557.) She was unable to zip, button or tie with the right hand. (Id.) Dr. Goccia diagnosed "[c]omplex regional pain syndrome, right hand," depression and anxiety, concluding that Newman was "severely limited in activities requiring the use of her right hand." (Id.)

On February 17, 2014, Dr. Scharfenberger completed a questionnaire in connection with Newman's application for benefits. (R. 558-70.) He wrote that Newman "reports severe pain in right wrist and hand with limited range of motion. Cannot lift or drive car." (R. 558.) The

expected duration of Newman's condition was "permanent for now." (R. 559.) Dr. Scharfenberger indicated that Newman could not lift or pull with her right hand, but she had no limitations on standing, walking, sitting, understanding, remembering, sustained concentration, social interaction, or adaption. (R. 566-67.) He also indicated decreased range of motion in Newman's right wrist. (See R. 569.)

Between February 17 and February 27, 2014, Newman attended three occupational therapy sessions at Crystal Run Healthcare. (R. 610-18, 623-25.) Newman reported "[p]ain rang[ing] from 4/10-10/10." (R. 610; see also R. 613, 616, 623.) Her therapists noted decreased range of motion, increased pain and decreased function after therapy sessions. (R. 611, 614.)

Beginning on February 7, 2014, Newman began treating with orthopedic surgeon Dr. Dimitrios Christoforou. (See R. 606-08.) Between February 7 and August 31, 2014, Newman visited Dr. Christoforou five times. (R. 606-08, 626-28, 634-38, 644-46, 662-64.) During these visits, Newman complained of pain that was worse with cold weather, stiffness, numbness, weakness and limited range of motion in her right index finger. (See R. 606-07, 626, 634, 636, 644, 646, 662, 664.) On examination, Dr. Christoforou consistently found Newman to be in no apparent distress; she had trace swelling and limited finger motion due to pain and stiffness; she exhibited "[n]ormal tenodesis of the digit with wrist flexion/extension," but pain with PIP flexion; and her right index finger was numb to light touch. (R. 607-08, 627-28, 635-36, 645-46, 663-64.) In his treatment notes for each of these visits, Dr. Christoforou noted a history consistent with CRPS "but without objective signs on exam." (R. 608, 628, 636, 646, 664.) An April 18, 2014 MRI revealed postsurgical scarring but was otherwise unremarkable. (R. 629, 646.)

Beginning on April 11, 2014, Newman complained to Dr. Christoforou of pain radiating up her right arm and into her upper back and neck. (R. 626.) A May 8, 2014 MRI of

Newman's cervical spine revealed "C5-C6 degenerative disc disease and spondylosis result[ing] in mild central canal and neural foramina stenosis." (R. 638.) During a follow-up appointment, Dr. Booker opined that the MRI results indicated a "[s]mall disc-osteophyte complex" at C5-C6. (R. 641.)

Because Newman's November 2013 stellate block failed to produce lasting pain relief (see, e.g., R. 634, 636), Newman and Dr. Christoforou discussed further surgical options (R. 646, 664). On September 3, 2014, Dr. Christoforou performed a radial digital nerve neuroma excision, radial digital nerve wrap, radial digital nerve neurolysis, revision carpal tunnel release, and carpal tunnel hyperthenar fat flap. (R. 665-69, 770-73.) Newman tolerated the procedure well with no complications. (R. 772.)

Between September and November 2014, Newman attended four follow-up appointments with Dr. Christoforou. (R. 670-76, 709-11, 731-33.) She initially reported improvement with pain, as well as improved sensation in the thumb and middle fingers of her right hand. (R. 670, 676.) By October 13, 2014, however, Newman reported pain throughout her hand and upper extremity resulting in an inability to move, eat or drink; she had visited the ER multiple times for dehydration, was sleeping more than fourteen hours a day, and was not attending therapy. (R. 709.) Dr. Christoforou opined that Newman's post-operative course was within normal limits, and that her heightened pain was consistent with somatoform symptoms. (R. 711.) Dr. Christoforou recommended cognitive behavioral therapy and "psych consultation." (Id.) By November 10, 2014, Newman reported that she was attending therapy and her pain was better controlled. (R. 731.) However, she had begun experiencing "occasional tremors." (Id.) Dr. Christoforou noted that Newman was in no apparent distress during these appointments. (R. 671, 677, 710, 732.)

In October and November 2014, Newman twice visited osteopathic physician Dr.

Andrew Faskowitz.  (R. 724-27, 738-40.)  Dr. Faskowitz noted that Newman was in no apparent distress (R. 726, 739); she had numbness in her index finger and allodynia throughout her hand (R. 727, 740); and she exhibited normal sensation to light touch (id.).  Dr. Faskowitz opined that Newman had CRPS of the right hand.  (Id.)  He advised Newman to continue using Oxycodone and started her on a trial of Tramadol.  (R. 727.)

Newman resumed occupational therapy at Crystal Run Healthcare after her surgery in September 2014; she attended fourteen sessions between September 15 and December 30, 2014. (R. 679-81, 683-85, 689-97, 712-17, 719-23, 728-30, 741-52.)  Newman reported difficulty with ADLs such as "carrying and lifting heavy objects, opening containers, making her bed, folding laundry, carrying and lifting dishes, mopping, manipulating buttons and lifting and manipulating a pot." (R. 680; see also, e.g., R. 692, 719, 722.)  She also complained of "constant numbness" in her right index finger (R. 680); pain ranging from "5/10" to "10/10" (see R. 683, 692, 695, 712, 715, 719, 741, 744, 747) with hypersensitivity to changes in temperature and weather (R. 689, 715, 750); decreased effectiveness of pain medication (R. 728); and difficulty moving her wrist (R. 683). Newman's therapists noted that she had difficulty moving her right index finger (R. 684); difficulty tolerating touch and range of motion exercises (R. 693, 713, 716, 720, 729); limitations in her ability to manipulate "due to loss of sensation in the index finger" (R. 684); "severe limit[ations] in her ability to use [her] hand due to pain" (R. 696); and once exhibited changes in skin color during treatment (R. 729).  Towards the end of 2014, Newman exhibited improved tolerance to treatment. (R. 742, 745, 748.)

## 2015

At her last visit with Dr. Christoforou on January 12, 2015, Newman presented with upper extremity pain radiating from her shoulder to her hand and newly onset tremors in her

extremity. (R. 761.) On examination, she was in no apparent distress; her incision had healed and swelling had subsided; range of motion in her right index finger was "[l]imited . . . but intact"; range of motion in all other digits was intact and she was "able to fully flex [her] middle, ring, [and] small" fingers; sensation was "grossly intact over the ulnar/median/superficial radial nerve distributions" with "5/5 strength to thenar/intrinsic/extrinsic muscles." (R. 762.) Dr. Christoforou recommended continued cognitive behavioral therapy, "psych" treatment and occupational therapy. (Id.)

Between January 13 and August 7, 2015, Newman saw Dr. Faskowitz four times. (R. 764-66, 816-19, 849-52, 874-77.) During each visit, Dr. Faskowitz noted that Newman was in no apparent distress (R. 766, 818, 851, 876); she exhibited numbness in her index finger and allodynia in her right hand, but her sensation was "[n]ormal to light touch throughout" (R. 766, 818, 851, 877). Dr. Faskowitz reiterated his assessment that Newman had CRPS of the right hand. (R. 766, 819, 852, 877.) He continued her Oxycodone and Tramadol prescriptions and started her on a trial of Nucynta for severe pain and Baclofen for tremors. (R. 766.) Newman later reported, however, that Tramadol was not strong enough, her insurance would not cover Nucynta, and that Baclofen worked when her tremors were bad. (R. 816.) In his notes from each of these appointments, Dr. Faskowitz opined that Newman was "[v]ery stable" on her current medication regimen. (R. 766, 819, 852, 877.)

On February 24, 2015, Newman met with neurologist Dr. David Jaeger at Crystal Run Healthcare. (R. 790.) She reported "bad spasms from her right hand spreading up to her neck. Pain meds have not been helpful . . . . Hard to get out of bed. Poor sleep. Tremor comes and goes. Triggered by cold. Pain is '24/7' for over a year but worse since September." (Id.) She reported "no feeling in index finger / weakness . . . [and] consistent stabbing / burning / aching / numbness." (Id.) On examination, Dr. Jaeger found "marked allodynia right forearm and hand, except anesthesia

index finger on right." (R. 792.) He was unable to properly evaluate Newman's right hand motor strength because of pain, but noted limited mobility in her index finger. (Id.) He diagnosed Newman with myoclonia and noted that while some of her right hand tremors were "distractable (would stop . . . with repetitive use of left hand)," he nevertheless had "concern for some element of myoclonus . . . given her dysfunction." (R. 792-93.) Dr. Jaeger prescribed a low dose of levetiracetam to suppress Newman's tremors. (R. 793.) During a March 17, 2015 follow-up appointment with Dr. Jaeger, Newman reported discontinuing levetiracetam after experiencing paralysis as a side effect. (R. 805; see also R. 817.)

On June 23, 2015, Newman presented to the ER and was admitted to the hospital with complaints of "moderate/severe and constant right arm pain" that "becomes more severe with bad weather," as well as tremors in her right arm. (R. 915.) She also reported right leg pain that prevented her from bending her leg at the joint (id.); "poor feeling in her right foot and pain . . . throughout her [right lower extremity] worse in her right thigh"; her right lower extremity would "cramp up and she [could not] move it" (R. 936). On examination, her right upper extremity was tremulous and she was unable to move her right index finger. (R. 917.) She was diagnosed with dehydration, CRPS, "[i]ntractable pain" and anxiety. (R. 933-34.) An MRI of her lower spine conducted in connection with her complaints of leg pain revealed "[s]mall disc bulges at L2-L3 and L4-L5 without spinal stenosis." (R. 948.) Newman was discharged from the hospital on June 26, 2015 with a prescription for diazepam, the generic form of Valium. (R. 941-42.)

During a July 10, 2015 visit with Dr. Faskowitz, Newman asserted that her CRPS had spread to her right leg. (R. 852.) She also stated that her new prescription of Valium, "5mg up to 4 per day," had "helped tremendously." (Id.) On examination, Dr. Faskowitz found that Newman exhibited normal leg strength and gait. (R. 851.) During her final visit with Dr. Faskowitz on

August 7, 2015, he opined that "it is medically necessary that [Newman] is seen at an academic Pain Management Center" with experience in CRPS. (R. 877.)

Between January 7 and October 12, 2015, Newman attended physical or occupational therapy twenty-six times. (R. 753-59, 794-99, 810-15, 829-37, 843-48, 853-73, 878-79, 896-908.) During her occupational therapy visits, Newman reported pain ranging from "5/10" to "10/10" radiating from her right index finger into the palm, arm and shoulder (see, e.g., R. 753, 757, 794, 797, 810, 813, 829, 832, 835, 855, 864, 871, 898, 904) that continued even after taking pain medication (R. 757, 794); her pain would vary, usually depending on the weather and temperature (R. 753, 757, 794, 813, 829, 896, 898, 904); tingling and excessive sweating in her right hand (R. 753, 794); tremors and spasms in her right hand, arm and neck (R. 794, 797, 810, 855); increased difficulty with ADLs as the year progressed (see R. 813, 829, 832, 855, 905); and that "when pain is very bad, . . . she must remain in the resting hand splint and use the hand very little" (R. 753; see also R. 797, 813). Her therapists noted waxing and waning progress in range of motion and function (R. 755, 795, 814, 836) but consistent limitation in use of her right hand "due to significant pain and weakness" (R. 755; see also R. 795, 833, 872); development of "sores on the left hand for overcompensating" (R. 836); occasional difficulty tolerating treatment (R. 758, 811, 872); and increased tremors and tingling after treatment (R. 758, 798).

Beginning in May 2015, Newman reported tingling in her lower extremities during therapy sessions. (See R. 835.) On July 3, 2015, she reported "pain in the R anterior thigh, tingling in the R foot, 'stabbing with a needle' in the R foot." (R. 843-44.) Newman's therapist noted that she was ambulating with a quad cane provided during her June 2015 ER visit. (Id.) Strength in her right lower extremity was limited by pain and/or concern about pain. (Id.) She was initially unable to move her right knee, but could do so after relaxation techniques. (Id.) During later appointments,

Newman reported waxing and waning pain, soreness, stiffness, tingling and swelling in her legs (R. 847, 858, 860, 862, 867, 878, 897, 902, 907), especially after prolonged walking (see, e.g., R. 847, 860, 878). Her therapists regularly noted improvement in pain and function in her legs after treatment. (R. 859, 861, 868, 879, 902.) Although Newman reported some improvement in her ability to walk (see, e.g., R. 869-70, 879), her therapist noted decreased strength and increased difficulty with walking due to pain during her final appointment on October 12, 2015 (R. 908).

On November 23, 2015, Dr. Faskowitz wrote a "To Whom It May Concern" letter opining that Newman required home care "[d]ue to the pain in [her] right arm and episodes o[f] pain in her right leg." (R. 962.) The letter further asserts that Newman "cannot perform light housekeeping and cannot drive"; she "normally wears a sling on her right arm to relieve and prevent an increase in pain"; she wears a compression glove to help with tremors; and she "uses a quad cane when she walks, due to episodes of pain in her right leg." (Id.)

**Mental Impairments**

Between July 16, 2014 and July 17, 2015, Newman met with psychotherapists Drs. Lisa Batson and Kimberly Robinson seven times. (R. 647-61, 686-88, 734-37, 784-89, 800-04, 825-28, 838-42, 891-95.) Her primary care physician had prescribed Remeron for depression and Klonopin for anxiety. (R. 656.) Newman reported numbness and "'terrible pain'" in her index finger; worsening CRPS with "no function in her hand, constant pain which is improved some in the summer but a consistent barrier to functioning." (Id.) She was dependent on her parents and others; she felt like a burden on others and was "frustrated" and "embarrassed." (Id.) She reported suicidal ideation during the 2013-2014 winter due to increased pain, "but was . . . able to reach out to family for support." (Id.) During later appointments, Newman reported increasing difficulty sleeping due to pain (R. 686, 734, 784, 825); irregular appetite (R. 686, 734, 838); continued frustration with

dependency on others, as well as irritability due to pain (R. 686, 784; see also R. 838, 891); and suicidal ideation on one occasion (R. 734) with subsequent improvement in independence and acceptance (R. 784).

On examination, Newman consistently exhibited good hygiene, appropriate dress and good eye contact; she was cooperative and oriented as to person, place, situation and time; her memory was "intact" and she maintained attention and concentration; her thought process was logical and appropriate; her judgment and insight were fair/good; she denied present suicidal ideation; and her gait and station were within normal limits. (R. 659, 687, 736, 787, 825, 838, 891.)

**Vocational Expert Testimony**

Vocational expert Sharon Levine testified at Newman's hearing. (R. 50-55.) ALJ Stacchini asked Levine whether jobs existed that Newman could perform, assuming she could perform a full range of light work with only occasional balancing, stooping, kneeling, crouching, right hand use, right hand fingering, and climbing ramps and stairs; no crawling or climbing ladders, ropes, or scaffolds; avoiding exposure to unprotected heights and hazardous machinery. (R. 51-52.) Levine testified that with those restrictions, Newman could perform the positions of counter clerk, usher, gate guard, and furniture rental clerk, which existed in significant numbers in the national economy. (R. 52.) Levine further opined that Newman's use of a cane for prolonged ambulation would not affect her ability to perform those jobs provided that the cane was not required for standing. (Id.) Newman, however, could not work as a gate guard if she could perform only simple, routine tasks. (R. 52-53.) If limited to sedentary work with the same limitations, there would be no jobs Newman could perform. (R. 53.) Newman also would be precluded from all work if she were required to be off task for twenty percent of the work period (R. 53-54) or if she missed two days of work a month (R. 54). Levine stated that when considering "occasional handling"

limitations, she assumed such limitations applied to both hands "because the DOT doesn't separate out one hand versus the other." (R. 54-55.)

**ALJ Stacchini's Decision**

On November 18, 2015, ALJ Stacchini denied Newman's application for benefits. (R. 9-23.) ALJ Stacchini applied the appropriate five step legal analysis. (R. 12-14.) First, he found that Newman "has not engaged in substantial gainful activity since September 25, 2012, the alleged onset date." (R. 14.) Second, ALJ Stacchini found that Newman had "the following severe impairments: complex regional pain syndrome; right carpal tunnel syndrome; right trigger finger; right hand mass/tendon; right nerve compression; cervical degenerative disc disease; myoclonus; anxiety; depression; and insomnia." (Id.) Third, ALJ Stacchini found that Newman did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Id.) ALJ Stacchini specifically addressed Newman's CRPS, carpal tunnel syndrome, trigger finger, right hand mass/tendon, myoclonus, and right never compression, concluding that those impairments did not meet the Listings' criteria because there was no evidence Newman could not ambulate or perform fine/gross movements effectively, she was not under current surgical management, had "not lost major function of the upper extremities," and did not exhibit any "neurological deficits as described in any part of medical listing 11.01." (R. 15.) ALJ Stacchini also concluded that Newman's mental impairments were not severe based on her activities of daily living; medical records describing her hygiene, dress, language, thought process, orientation and memory to be within normal limits; and her lack of episodes of decompensation. (R. 15-16.)

ALJ Stacchini determined that Newman had the residual function capacity ("RFC") to "perform less than the full range of light work"; she "is able to sit for up to 6 hours and stand/walk

for up to 6 hours with regularly scheduled breaks" and

> is further limited to occasional ramps and stairs, no ladders, ropes or scaffolds, occasional balancing, stooping, kneeling, and crouching and no crawling. [Newman] is limited to occasional right handling and right fingering. She must be permitted to use a cane for uneven terrain and prolonged ambulation defined as being greater than two blocks. She must avoid exposure to unprotected heights, hazardous machinery, and extreme cold. She is able to understand, remember, and carry out simple routine tasks.

(R. 16.)

ALJ Stacchini accorded "some" weight to Dr. Goccia's consultative opinion that Newman was "severely limited" in the use of her right hand, but noted that "'severe' is ill defined and does not provide a function by function analysis." (R. 20.) He accorded "little" weight to the portions of Dr. Scharfenberger's November 2013 and February 2014 opinions asserting limitations on Newman's ability to stand, walk, sit, crouch, climb, push, pull or manipulate with her right upper extremity; he accorded "significant" weight to the portions of those opinions finding no limitations on Newman's physical or mental abilities. (R. 20-21.)

ALJ Stacchini also concluded that Newman's "statements concerning the intensity, persistence and limiting effects" of her symptoms were "not entirely credible." (R. 17.) He supported this determination with a review of the medical evidence of record, Newman's own testimony regarding her activities of daily living and his observations of Newman at the hearing. (R. 17-20; see also pages 27-36 below.)

At the fourth step, ALJ Stacchini determined that Newman was "unable to perform her past relevant work as a Clerk-Typist and Cosmetologist" (R. 21), but that given her "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy" that Newman could perform (R. 22). ALJ Stacchini noted that Newman is considered younger individual, that she has a high school education and is able to

communicate in English.  (R. 21.)  He relied on vocational expert Levine's testimony that a person with these characteristics and limitations could work as a counter clerk, usher or furniture rental clerk.  (R. 22.)  Accordingly, ALJ Stacchini concluded that Newman was not "under a disability, as defined in the Social Security Act, from September 25, 2012" through November 18, 2015.  (Id.)

## ANALYSIS

### I.  THE APPLICABLE LAW

#### A.  Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[3/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the

---

[3/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[4/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[5/]

**B.    Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[6/] "'Thus,

---

[4/]    See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[5/]    See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[6/]    See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[7/]

      The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[8/] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[9/]

      The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir.

---

[7/]    See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[8/]    See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[9/]    See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

2012); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 384 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

<u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[10/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[10/] Accord, <u>e.g.</u>, <u>Talavera</u> v. <u>Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 774; <u>see also</u>, <u>e.g.</u>, <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d at 183-84; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 132; <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79-80 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46; <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995); <u>Berry</u> v. <u>Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only his medical capacity but also his age, education and training. See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[11/]

## II. NEWMAN'S CLAIM IS REMANDED

### A. ALJ Stacchini's Credibility Determination is Unsupported by Substantial Evidence

#### 1. Legal Standards Governing Credibility Determinations

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted).[12/] In addition, "courts must

---

[11/]    See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

[12/]    See, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.' Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.'"); Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia (continued...)

show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[13] Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted).

When an ALJ determines that a claimant's own statements regarding her symptoms are not supported by the record, that "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186

---

[12] (...continued)
v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[13] Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

at *2 (July 2, 1996).[14/]   The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.  The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted) (citing 20 C.F.R. §§ 404.1529(a), 404.1529(b), and the now-superseded SSR 96-7p).

### 2. **Application**

ALJ Stacchini determined that Newman's "medically determinable impairments could

---

[14/]   In March 2016, the SSA released SSR 16-3p, which provides updated guidance on evaluating a claimant's assertions about the work-preclusive nature of her symptoms.  See generally SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016); see also, e.g., Duran v. Colvin, 14 Civ. 8677, 2016 WL 5369481 at *13 n.27 (S.D.N.Y. Sept. 26, 2016) ("SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), and clarifies the policies set forth in the previous SSR.").  SSR 16-3p, however, was not made retroactive and the Court therefore applies SSR 96-7p as the ruling in effect at the time of the ALJ's decision in this case.  See, e.g., Crampton v. Comm'r of Soc. Sec., No. 16-CV-0356, 2017 WL 2829515 at *6 n.3 (N.D.N.Y. June 29, 2017); Smith v. Colvin, No. 14-CV-1752, 2016 WL 1170910 at *7 n.3 (D. Conn. Mar. 23, 2016).  In any event, the substance of the two-step process for evaluating claimants' symptoms discussed herein was not modified by SSR 16-3p.  Accord SSR 16-3p, 2016 WL 1119029 at *3-4; see also, e.g., Burgess v. Colvin, 15 Civ. 9585, 2016 WL 7339925 at *11 (S.D.N.Y. Dec. 19, 2016) (citing SSR 16-3p for an explanation of the two-step process for assessing claimants' statements about their symptoms).  Rather, SSR 16-3p's updated guidance is a matter of emphasis: whereas SSR 96-7p "placed a stronger emphasis on the role of the adjudicator to make a 'finding about the credibility of the individual's statements about the symptom(s) and its functional effects' . . . S.S.R. 16-3p espouses a more holistic analysis of the claimant's symptoms, and 'eliminate[s] the use of the term "credibility"' from sub-regulation policy."  Acosta v. Colvin, 15 Civ. 4051, 2016 WL 6952338 at *18 (S.D.N.Y. Nov. 28, 2016).

reasonably be expected to cause" her alleged symptoms, but that her "statements concerning the intensity, persistence and limiting effects" of those symptoms were "not entirely credible." (See page 20 above.) He provided five specific reasons for this determination. (See R. 20.)

### a. **Evidence of Atrophy**

ALJ Stacchini found that Newman's claim that she "spends most days lying down the entire day with her leg elevated" was undermined by the lack of medical records showing "signs such as atrophy or loss of strength that one may expect with such extreme inactivity." (Id.) This argument is problematic for several reasons.

"[I]t is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'" Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998);[15/] see also, e.g., Cora v. Colvin, 15 Civ. 1549, 2016 WL 4581343 at *2 (S.D.N.Y. Sept. 1, 2016) ("'[I]n the absence of a medical opinion to support the ALJ's finding as to a plaintiff's ability, it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'"). After issuing this oft-quoted principle, the Second Circuit in Balsamo provided an example of offending reasoning:

> Here, for example, the ALJ stated without citing to any medical opinion that "there is no atrophy of any muscle groups indicative of disuse for the purpose of avoiding discomfort [ ] as one would expect . . . based on the claimant's allegation of constant and totally disabling pain." In so finding, the ALJ plainly did not "choose between properly submitted medical opinions," but rather improperly "set

---

[15/] Accord, e.g., Salisbury v. Colvin, 13 Civ. 2805, 2015 WL 5458816 at *26 (S.D.N.Y. Sept. 1, 2015), R. & R. adopted, 2015 WL 5566275 (S.D.N.Y. Sept. 21, 2015); Garcia v. Barnhart, 01 Civ. 8300, 2003 WL 68040 at *6 (S.D.N.Y. Jan. 7, 2003) ("The ALJ must defer questions requiring medical expertise to physicians."); Andino v. Bowen, 665 F. Supp. 186, 191 (S.D.N.Y. 1987) ("[T]he Secretary may not 'substitute his or her own inferential judgment for a competent medical opinion, particularly where the ALJ's judgment assumes some degree of medical expertise and would amount to rendering an expert medical opinion which is based on competence he or she does not possess.'").

his own expertise against that of [ ] physician[s]" who submitted opinions to him. Balsamo v. Chater, 142 F.3d at 81. In other words, the Second Circuit views "one would expect" arguments skeptically where they constitute a medical judgment unsupported by a competent opinion justifying the "expectation."

Courts in this Circuit accordingly have rejected arguments based on the lack of medical evidence "one would expect" given a claimant's assertions. See, e.g., Oomen v. Berryhill, 16 Civ. 3556, 2017 WL 1386355 at *15 (S.D.N.Y. Apr. 17, 2017) ("The ALJ appears to cite [claimant's] treatment history as a reason for discounting his alleged symptoms, observing that the 'claimant has not generally received the type of medical treatment one would expect for a totally disabled individual.' Yet . . . the ALJ does not cite the opinion of any medical professional for the notion that [claimant's] medical treatment fell below the level of a truly disabled person." (record citation omitted)); Wilson v. Colvin, 213 F. Supp. 3d 478, 490 (W.D.N.Y. 2016) (improper for ALJ to be "'playing doctor,' by relying on his own lay opinion"); Primes v. Colvin, No. 15-CV-06431, 2016 WL 446521 at *4 (W.D.N.Y. Feb. 5, 2016) ("With respect to the ALJ's observation that it was 'unusual' for Dr. Toor to have found no muscle atrophy, 'given the limitations the claimant alleges[,]' this amounts to the ALJ impermissibly relying on his own lay opinion to fill perceived gaps in the evidentiary record." (record citation omitted)).[16]

---

[16] These cases can be distinguished from those in which the ALJ made the determination—based on common sense rather than medical expertise—that a claimant's activities of daily living are not limited to the extent "one would expect" given his or her assertions of completely debilitating symptoms. See, e.g., Trancynger v. Comm'r of Soc. Sec., 16 Civ. 2153, 2017 WL 3868798 at *12 (S.D.N.Y. Sept. 5, 2017); Evans v. Comm'r of Soc. Sec., 110 F. Supp. 3d 518, 539-40 (S.D.N.Y. 2015) (no clear error where "the ALJ found that [the claimant's] 'complaints of disabling symptoms and limitations' were inconsistent with her described daily activities, 'which [were] not limited to the extent one would expect.'").

Like the ALJ's inference in <u>Balsamo</u>, ALJ Stacchini's inference that a measurable loss of strength or muscle atrophy necessarily would result from the "extreme inactivity" allegedly asserted by Newman is unsupported by any medical opinion or SSA rulings permitting such inferences.  This basis for the ALJ's credibility determination thus is improper as a matter of law.

In addition, ALJ Stacchini's "one would expect" argument is premised on a misrepresentation of Newman's testimony.  According to ALJ Stacchini, Newman alleged "that since December 2012 she spends most days lying down the entire day with her leg elevated."  (R. 20.)  Although Newman testified to being bed-bound for "weeks at a time" when her pain was at its worst (<u>see</u> page 5 above), she repeatedly testified that her level of activity varied from day to day with her pain level, which itself varied with the weather (<u>see</u>, <u>e.g.</u>, R. 34 ("[I]f I'm having an okay day where I'm not in my bed, I can sometimes put something in the microwave."), 34-35 ("Q: How many days do you spend just in bed?  A: It depends on the weather."), 37 ("Q: You go to family outings?  A: Depends.  Depends on how I feel."), 38 ("Q: How many hours a day do you spend just laying down?  A: It depends on the day."); <u>see also</u> pages 4-6 above).

ALJ Stacchini's reference to Newman's "extreme inactivity" beginning in December 2012 also ignores her testimony that she attempted to go back to work in early 2013 (<u>see</u> page 4 above) and that she spent much of her time visiting doctors and therapists (<u>see</u> page 5 above).  Indeed, at times Newman was attending medical appointments roughly four times per week.  (<u>See</u> page 6 above.)  Many of these appointments were with occupational or physical therapists with whom Newman worked on strengthening her hand and legs.  (<u>See</u> pages 7-8, 11, 13, 16-17 above.)  Finally, Newman testified that when not attending appointments, she would "lay[] on the couch watching TV" (<u>see</u> page 5 above), but such testimony—without clarifying follow-up questioning (<u>see</u> R. 38)—hardly constitutes a comprehensive account of her day-to-day life necessary to support

an inference of "extreme inactivity."  Indeed, Newman's testimony that taking a shower often left her "bed-bound for about 2-3 hours" afterwards (see page 5 above) implies that she was not bed-bound the rest of her day.

The first "specific reason" cited by ALJ Stacchini to support an adverse credibility determination therefore lacks a basis in the record and in law.

**b.    Newman's Subsistence During the Six Months Her Parents Spent in Florida**

As the second specific reason for his adverse credibility determination, ALJ Stacchini found that Newman's testimony that she was capable of "nearly no activities of daily living since December 2012 . . . despite living alone for six months out of the year" was inconsistent with her statements to Dr. Goccia that "she helps with cleaning, laundry, and shopping and is able to shower and dress herself."  (R. 20; see also R. 555; page 10 above.)  This argument is premised on at least two misrepresentations of the record.

First, Newman's statements to Dr. Goccia regarding her activities of daily living were made in January 2014.  (R. 554-55.)  The relevant period did not end, however, until ALJ Stacchini issued his decision in November 2015.  (See page 2 above.)  Much happened during that almost two-year span.  (See generally pages 10-18 above.)  Perhaps most importantly, Newman underwent a fourth surgery on her right hand in September 2014.  (See page 12 above.)  SSA guidelines explicitly note surgery as a possible source of CRPS, see SSR 03-2p, 2003 WL 22399117 at *1 (Oct. 20, 2003) ("CRPS . . . can also result from . . . surgery."), and indeed, Newman testified that her CRPS symptoms "got progressively worse" after her fourth surgery (R. 34; see also page 4 above).  The course of treatment detailed in the post-September 2014 medical records, as well as Newman's subjective reports of increasing pain contained therein, support her testimony.  (See generally pages

12-17 above).

ALJ Stacchini's comment that Newman "alleges not engaging in any activity, despite living alone for six months out of the year" is even more far afield. (R. 20.) The clear implication of this comment is that Newman's complaints of activity-preclusive pain cannot be credible because, if true, she could not have subsisted without her parents for six months. Yet, when ALJ Stacchini asked at the hearing, "What do you do in the six months when you live at home alone," Newman responded, "My uncle comes by basically daily. He comes in and helps me." (R. 34.) Newman also testified that she took "Medicaid cab rides" to doctor's appointments (id.), and that a neighbor "comes up to help" with cleaning when her parents are away (R. 35).[17]

The second "specific reason" ALJ Stacchini claimed supported an adverse credibility determination therefore lacks support in the record.

### c.    Newman's Use of a Sling

ALJ Stacchini next concluded Newman's testimony that "since the beginning of 2013, she has kept her hand in a sling anytime she leaves the house . . . [was] not supported by statements made to her doctors in the medical records." (R. 20.) Newman testified at her hearing:

> [ALJ Stacchini]: Now you're in a sling today. How often do you wear the sling?
>
> [Newman]: Anytime I travel or when I'm having severe pain up to my shoulder with the splint.
>
> Q: So every time you got to a doctor's appointment, go out with anybody, go anywhere. And how often when you're around the house do you use it?
>
> A: I try not to use it in the house unless I'm having severe tremors. Then it kind of

---

[17]    Newman's testimony that she requires assistance with ADLs when her pain flares and her parents are absent is partly corroborated by Dr. Faskowitz's November 23, 2015 "To Whom It May Concern" letter opining that Newman required home care because, inter alia, she "cannot perform light housekeeping and cannot drive." (See page 17 above.)

helps stabilize me along with my splint.

(R. 33-34.)  Newman later testified: "I've had a sling since the first surgery.  However, I've had to wear it in the car and besides I tried to attempt to fly one time.  And I had to wear the sling during that time.  But as of December 2014 is when I am consistently always in the sling and the splint." (R. 41.)

"The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say."  Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983).  However, ALJ Stacchini's assertion that Newman's testimony was "not supported by statements made to her doctors in the medical records" ignores those very records.  Newman's doctors and therapists were well aware of her use of a splint, brace and/or compression glove to alleviate pain (see, e.g., R. 385, 407, 409, 412, 419, 476, 672-73, 712, 729, 742, 753, 761-62, 794, 797, 800, 805, 817, 829, 850, 855), and some of Newman's doctors did specifically note her use of a sling.  Dr. Robinson reported that Newman presented to her March 16, 2015 appointment with her right arm in a sling.  (R. 800.) Newman similarly presented to her June 19 and August 17, 2015 appointments with Dr. Batson wearing a sling.  (R. 838, 891.)  During her May 26, 2015 occupational therapy appointment, Newman and her therapist "[d]iscussed various sling options for supporting the arm during the day when needed."  (R. 836.)  Finally, Dr. Faskowitz's "To Whom It May Concern" letter stated that Newman "normally wears a sling on her right arm to relieve and prevent an increase in pain."  (R. 962.)

The third "specific reason" ALJ Stacchini gave to support an adverse credibility determination therefore lacks support in the record.

### d.    Newman's Demeanor At the Hearing

ALJ Stacchini gave "some slight weight" to the fact that although Newman "alleged

pain of 7 of 10" at her October 22, 2015 hearing, she "betrayed no evidence of pain or discomfort while testifying." (R. 20.) An ALJ "'may . . . consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements.'" Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998);[18] see also 20 C.F.R. § 416.929(c)(3); SSR 96-7p, 1996 WL 374186 at *5 (July 2, 1996). The Second Circuit has cautioned, however—and ALJ Stacchini's opinion acknowledges (R. 20)—that such observations "should be assigned only 'limited weight.'" Schaal v. Apfel, 134 F.3d at 502; accord, e.g., Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643 (2d Cir. 1983) ("The ALJ's observation that [the claimant] sat through the hearing without apparent pain, being that of a lay person, is entitled to but limited weight.").[19]

The Court is skeptical that ALJ Stacchini's observations are worth any weight in the context of this case. The medical records are replete with notes reflecting Newman's complaints of pain of "7/10" and higher (see pages 7-8, 10-11, 13, 16 above), but not one instance in which a medical expert questioned her sincerity. Indeed, Newman's treating physicians found her complaints credible enough to justify surgery (see, e.g., page 12 above), a ganglion stellate block (see page 9 above), and an ongoing prescription for narcotic pain medication (see, e.g., pages 13-14 above; see also R. 727). Moreover, ALJ Stacchini's observations move the goalpost: by focusing on how Newman's pain affected her demeanor at the hearing, he ignored her claim that pain rendered her right hand nonfunctional. ALJ Stacchini did not assert, for example, that he observed Newman use

---

[18] Accord, e.g., Velez v. Colvin, 14 Civ. 1953, 2016 WL 3461155 at *10 (S.D.N.Y. Apr. 19, 2016), R. & R. adopted, 14 Civ. 1953, 2016 WL 3481154 (S.D.N.Y. June 21, 2016); Carattini v. Colvin, 13 Civ. 7806, 2015 WL 1499509 at *11 (S.D.N.Y. Mar. 31, 2015); Mangum v. Colvin, 13 Civ. 4213, 2015 WL 629403 at *14 (S.D.N.Y. Feb. 13, 2015).

[19] Accord, e.g., Velez v. Colvin, 2016 WL 3461155 at *10; Mangum v. Colvin, 2015 WL 629403 at *14.

her right hand during the hearing. Thus, even assuming ALJ Stacchini's observations are entitled to any weight, those observations neither account for nor outweigh the numerous medical records supporting Newman's claims regarding the effects of pain on the functionality of her right hand. (See generally pages 6-17 above.)

The fourth alleged "specific reason"—to the extent it is worth any weight—therefore fails to support the breadth of ALJ Stacchini's adverse credibility determination.

### e. Newman's "Stable" Medication Regimen

Finally, ALJ Stacchini noted "that current records from pain management . . . note that [Newman] is very stable on her current regime[n] without current side effects noted." (R. 20.) Dr. Faskowitz noted on four occasions between January 13, 2015 and August 7, 2015 that Newman was "[v]ery stable" on her current medication regimen. (See page 14 above.) These records are unclear, however, whether "stable" means Newman's pain was under control. For example, during his final appointment with Newman on August 7, 2015, Dr. Faskowitz noted that she was "stable" on her current regimen, but nevertheless opined that "it is medically necessary that [Newman] is seen at an academic Pain Management Center." (See pages 15-16 above.) Such a referral would be unnecessary if her pain was fully controlled. Moreover, the record contains several instances in which Newman reported severe pain even when on her medication (see, e.g., page 8 above), and some of those instances occurred after Dr. Faskowitz began noting Newman's "stability" (see pages 14, 16 above; see also R. 757, 794).

The fifth and final "specific reason," like the prior four reasons, relied on by ALJ Stacchini to support his adverse credibility determination lacks support in the record.

The Court therefore remands for reconsideration. See, e.g., Turcotte v. Comm'r of Soc. Sec., No. 16-CV-1100, 2017 WL 3437895 at *5 (N.D.N.Y. Aug. 10, 2017) ("[T]he Court

agrees with plaintiff that substantial evidence does not support the ALJ's credibility determination. . . . Therefore, on remand, the ALJ should also re-evaluate plaintiff's credibility."); Taylor v. Comm'r of Soc. Sec., 13 Civ. 5995, 2014 WL 2465057 at *13 (S.D.N.Y. May 21, 2014) (Davison, M.J. & Briccetti, D.J.) (remanding where "the ALJ failed to sufficiently and accurately discuss several factors relevant to determining Plaintiff's credibility").

### B. ALJ Stacchini's Determination That Newman Retains the Capacity For Occasional Right Handling and Right Fingering Also Must Be Reconsidered on Remand

ALJ Stacchini determined that Newman retained the RFC to "perform less than the full range of light work," except that she is limited to, inter alia, "occasional right handling and right fingering." (R. 16.) Given Newman's testimony that pain rendered her right hand nonfunctional, this RFC determination is at least partly based on ALJ Stacchini's conclusion that Newman's testimony was not credible. See, e.g., Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account."). As discussed above, ALJ Stacchini's credibility determination is not supported by substantial evidence and must be reconsidered on remand. (See pages 27-36 above.) The ALJ, therefore, should also reconsider the light work and "occasional right handling and right fingering" aspects of the RFC determination on remand. See, e.g., Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) ("Because we agree that the ALJ did not properly evaluate the Appellant's testimony regarding her pain, we are unable to give his calculation of Appellant's RFC meaningful review. On remand the ALJ must consider Appellant's subjective complaints of pain under the proper standard and calculate her RFC accordingly.").

In so doing, the ALJ also should reconsider the other reasoning supporting the determination that Newman retained the functional capacity for "occasional right handling and right

fingering."  (See generally R. 18 (outlining the bases for ALJ Stacchini's right hand RFC determination).)  Although Newman's occupational therapy treatment notes occasionally reflect modest improvement, a comprehensive review of those records indicates that Newman's right hand pain and concomitant reduced functional capacity were a constant, with variation in severity depending on the weather.  (See pages 7-8, 11, 13, 16 above.)  Furthermore, Newman continued occupational therapy until late September 2015.  (See R. 904; see also page 16 above.)  Newman's later therapy session records consistently indicate functional limitations for her right hand "due to significant pain and weakness."  (See page 16 above.)  On remand, the ALJ should consider the trends reflected in Newman's more recent treatment records and should avoid "cherry-pick[ing] evidence in support of his own conclusions."  Woodson v. Colvin, 15 Civ. 2353, 2016 WL 4362105 at *11 (S.D.N.Y. Aug. 10, 2016).

Finally, the Court notes that the "occasional right handling and right fingering" aspect of ALJ Stacchini's RFC determination is unsupported by any medical expert opinion.  (See generally R. 20-21 (discussing opinion evidence).)  Dr. Goccia opined that Newman was "severely limited in activities requiring the use of her right hand" (see page 10 above), but ALJ Stacchini gave this opinion only "some weight" because "'severe' is ill defined and does not provide a function by function analysis" (R. 20).  Dr. Goccia's observation that Newman was "unable to zip, button, and tie with the right hand" should have provided enough context and constituted enough of a "function by function analysis" to call into question Newman's capacity for "occasional right handling and right fingering."  (R. 557.)

Furthermore, ALJ Stacchini opined: "[t]o the extent that [Dr. Goccia's] opinion is consistent with the overall record, limitations to the right non-dominant hand are addressed in the above residual functional capacity."  (R. 20.)  Setting aside the conclusory appeal to "consistency

with the record," "[t]he Court in the past has criticized ALJ decisions that first state an RFC determination and then state that medical evidence is consistent with the ALJ's RFC determination, a way of reasoning that puts the cart before the horse." Campbell v. Comm'r of Soc. Sec., 15 Civ. 2773, 2016 WL 6462144 at *13 & n.15 (S.D.N.Y. Nov. 1, 2016) (Peck, M.J.) (citing cases). This principle takes on additional importance when a medical opinion favorable to the claimant is being dismissed as inconsistent with the ALJ's RFC determination. Dr. Goccia's opinion therefore should be reconsidered on remand.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion (Dkt. No. 23) is DENIED and Newman's motion (Dkt. No. 16) is GRANTED to the extent of remanding the case to the Commissioner for further consideration.

SO ORDERED.

Dated:    New York, New York
          October 6, 2017

**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:      All Counsel